UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN DRAGASITS,<br><br>                              Plaintiff,<br><br>v.<br><br>YU et al.,<br><br>                              Defendants. | Case No.: 16-cv-01998-BAS-JLB<br><br>**REPORT AND RECOMMENDATION FOR ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>**[ECF No. 36]** |

Before the Court is Defendants' second Motion to Dismiss Plaintiff Stephen Dragasits' complaint brought under the Civil Rights Act, 42 U.S.C. § 1983. (ECF No. 36.) The Court submits this Report and Recommendation to United States District Judge Cynthia Bashant pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1 of the Local Rules of Practice for the United States District Court for the Southern District of California. After a thorough review of Plaintiff's amended complaint, the parties' motion and opposition papers, and all supporting documents, and for the reasons discussed below, the Court **RECOMMENDS** that the District Court **GRANT** Defendants' motion to dismiss (ECF No. 36) and dismiss Plaintiff's amended complaint.

## I. PROCEDURAL BACKGROUND

Plaintiff Stephen Dragasits, a state prisoner proceeding *pro se* and *in forma pauperis*, initiated the present suit by filing a complaint in this Court on August 8, 2016. (ECF No. 1.) Plaintiff alleged that the State of California, the Richard J. Donovan Correctional

Facility ("RJDCF"), several RJDCF health care officials, and a Deputy Director of the California Department of Corrections and Rehabilitation's Health Care Services Appeals Branch denied his Eighth Amendment, Fourteenth Amendment, and California state law rights to proper medical treatment and due process while he was incarcerated at RJDCF. (*See id.* at 27–39.)[1]

On November 15, 2016, the Honorable Roger T. Benitez *sua sponte* dismissed Plaintiff's claims against Defendants the State of California, RJDCF, and individual health care officials Gines, Guldseth, Kelso, and Van Buren. (ECF No. 5 at 10.) In addition, Judge Benitez *sua sponte* dismissed Plaintiff's Fourteenth Amendment due process claim against all named Defendants. (*Id.*) Remaining Defendants Dr. Jin Yu, Dr. R. Walker, Dr. S. Roberts, Dr. M. Glynn, and California Department of Corrections and Rehabilitation ("CDCR") Deputy Director J. Lewis filed a motion to dismiss the remaining claims in Plaintiff's complaint. (ECF No. 12.)

On September 13, 2017, Judge Benitez adopted this Court's Report and Recommendation and dismissed all of Plaintiff's claims against Defendants. (ECF No. 26.) The Court dismissed without leave to amend Plaintiff's Eighth Amendment claims against Defendants Walker, Roberts, Glynn, and Lewis relating to their denial of his health care appeals. (*Id.* at 5.) The Court also dismissed without leave to amend Plaintiff's Eighth Amendment claim against Defendant Roberts for deliberate indifference under a theory of supervisory liability. (*Id.*) Plaintiff was granted leave to amend his Eighth Amendment claims for deliberate indifference against Defendants Yu, Walker, Glynn, and Lewis and his state law claims for medical negligence and malpractice. (*Id.* at 6.)

On October 10, 2017, Plaintiff filed his First Amended Complaint ("amended complaint"). (ECF No. 27.) In his amended complaint, Plaintiff reasserts his Eighth Amendment and state law claims against Defendants Yu, Walker, Glynn, and Lewis. (*Id.*)

---

[1] Citations to documents filed on the public docket of this action refer to the pagination assigned by the CM/ECF system.

Plaintiff also reasserts his Eighth Amendment claims against Defendant Roberts, which had been dismissed with prejudice. (*Id.*) On November 7, 2017, Defendants filed the instant Motion to Dismiss the amended complaint ("motion to dismiss"). (ECF No. 36.) Plaintiff opposes Defendants' motion to dismiss. (ECF No. 40.)[2]

## II. FACTUAL BACKGROUND[3]

Plaintiff's amended complaint largely contains the same factual allegations as his original complaint. A more detailed recitation of the facts was set forth in the Report and Recommendation issued on Defendants' first motion to dismiss and will not be repeated here. (*See* ECF No. 21 at 1–11.) A summary of the most relevant facts is provided here.

Plaintiff is a state prisoner confined at RJDCF in San Diego, California. (ECF No. 27 at 31.) Prior to arriving at RJDCF, Plaintiff was temporarily confined at the California Institution for Men. (*Id.* at 30–31.) He was transferred to RJDCF on or around December 2, 2013. (ECF No. 1 at 86.)[4] Plaintiff alleges that he suffers from several arthritic ailments and degenerative diseases that involve chronic pain in his neck, back, elbows, knees, and feet. (ECF No. 27 at 31–38.) In addition, Plaintiff alleges that he has a history of syncope and dizziness dating back to 2012 and that he last suffered an episode of syncope in October 2013. (*Id.*) Plaintiff asserts that on September 13, 2013, medical providers at the California Institution for Men issued him a lower bunk chrono due to his medical conditions. (*Id.* at 30–31.) The crux of the instant case is that Defendants did not provide Plaintiff the same accommodation at RJDCF.

Defendant Yu was Plaintiff's primary care physician at RJDCF and saw Plaintiff

---

[2] In his opposition, Plaintiff notes that he "may need the appointment of Counsel with the amendment of the Complaint to present his claims to this Court," but does not request the appointment of counsel. (ECF No. 40 at 3.) The Court does not construe this statement as a motion for the appointment of counsel.

[3] The allegations contained in Plaintiff's amended complaint are accepted as true for purposes of assessing Defendants' motion to dismiss only. In addition, this Report and Recommendation does not provide a summary of all of the facts presented in the complaint but only those that are relevant to Plaintiff's claims against the remaining Defendants: Glynn, Lewis, Roberts, Walker, and Yu.

[4] The Court's order granting Defendants' first motion to dismiss incorporated the exhibits in Plaintiff's initial complaint into the amended complaint. (ECF No. 26 at 6.)

approximately eight times between February 10, 2015 and August 21, 2015. (*See* ECF No. 1 at 50, 253–86.) On May 13, 2015, Plaintiff asked Defendant Yu to renew his lower bunk chrono. (ECF No. 1 at 262.) After physically examining Plaintiff and reviewing his medical records, Defendant Yu found there was no medical indication that Plaintiff's condition warranted a lower bunk. (*Id.*) However, Defendant Yu ordered an x-ray "to better understand the medical issues." (*Id.*) On June 5, 2015, Defendant Yu again physically examined Plaintiff, observed Plaintiff playing basketball, and reviewed Plaintiff's medical records and recent x-ray results. (*Id.* at 268–69.) Defendant Yu again declined to issue a lower bunk chrono for Plaintiff at that time as he saw no medical indication to do so, but offered to prescribe Plaintiff pain medication. (*Id.*) On June 22, 2015, Defendant Yu physically examined Plaintiff and still saw no need for a lower bunk, but ordered x-rays of Plaintiff's knee to determine if there were any abnormalities. (*Id.* at 272.) Defendant Yu saw Plaintiff on July 20, 2015 and, after physically examining Plaintiff, once again found that a lower bunk was not necessary. (*Id.* at 276.) Defendant Yu instead ordered x-rays of Plaintiff's elbow and referred him to a physical therapist. (*Id.*)

Plaintiff alleges that on August 3, 2015, he fell from his upper bunk for the first time. (ECF No. 27 at 41.) A registered nurse saw Plaintiff on August 5, 2015, one day after Plaintiff submitted a request for medical services. (ECF No. 1 at 229–31.) The nurse noted that Plaintiff requested a lower bunk during their visit, but did not refer Plaintiff to a doctor and instead recommended he walk instead of playing basketball for exercise. (*Id.*) Plaintiff does not allege that he saw Defendant Yu for evaluation as a result of this alleged fall or that he ever informed Defendant Yu of this fall. (*See generally* ECF No. 27.) Plaintiff saw Defendant Yu again on August 20, 2015. (ECF No. 1 at 281–82.) Nothing in Defendant Yu's detailed medical notes indicates Plaintiff mentioned the fall (*id.*) and Plaintiff does not allege that he informed Defendant Yu of the alleged fall. (*See generally* ECF No. 27.) During this visit, Defendant Yu physically examined Plaintiff, noted that he had seen Plaintiff playing basketball, and once again found that Plaintiff's medical condition did not merit a lower bunk. (*Id.*) Plaintiff communicated to Defendant Yu that he was "building

4

up my case" for a lower bunk. (*Id*.)

The next day, on August 21, 2015, Plaintiff alleges that he fell while trying to climb onto his upper bunk. (ECF No. 27 at 43.) Defendant Yu was onsite and saw Plaintiff the same day, but declined to issue a lower bunk chrono before reviewing the results of x-rays he ordered. (ECF No. 1 at 232–34.)[5] This was Plaintiff's last visit with Defendant Yu, who subsequently left RJDCF. (*Id*. at 50, 253–86; ECF No. 21 at 22–23.)[6] Thereafter, Dr. Guldseth, who is not a named defendant, became Plaintiff's primary care physician. (*See* ECF No. 1 at 287–307.) Defendant alleges that he fell off the upper bunk once more before Dr. Guldseth issued him a lower bunk chrono on December 28, 2015. (ECF No. 27 at 33, 47.)

Plaintiff appealed Defendant Yu's initial decision not to issue him a lower bunk chrono on or about May 12, 2015. (ECF No. 1 at 51–52.)[7] Plaintiff filed a second appeal of Defendant Yu's decision not to issue him a lower bunk chrono on June 9, 2015. (*Id*. at 59–60.) Defendants Walker, Glynn, Roberts, and Lewis denied both of Plaintiff's appeals at every level of review up to the final, third level of review. (*Id*. at 53–58, 62–66.) Plaintiff filed a third appeal on September 19, 2015 contesting Defendant Yu's decision not to issue Plaintiff a lower bunk chrono. (*Id*. at 48–49.) This appeal was screened out as duplicative of Plaintiff's prior appeals and because Defendant Yu was no longer at RJDCF. (*Id*. at 50.)

### III. DISCUSSION

**A. Legal Standards**

1. <u>Motion to Dismiss for Failure to State a Claim</u>

The Federal Rules of Civil Procedure require that a plaintiff's complaint must provide a "short and plain statement of the claim showing that [he] is entitled to relief."

---

[5] As per the treatment notes written by R.N. Gines. (ECF No. 1 at 232–34.)

[6] Plaintiff's follow-up visit to evaluate his lower bunk request after the x-rays were available was with Dr. Deaton on September 3, 2015. (*Id*. at 309–10.) Dr. Deaton is not a named defendant.

[7] Plaintiff's grievance is dated May 12, 2015 (*id*. at 51); however, Defendant Yu's progress notes indicate that he examined Plaintiff and denied the request for a lower bunk on May 13, 2015. (*Id*. at 262.)

5

Fed. R. Civ. P. 8(a)(2). The pleading standard that Rule 8 announces does not require detailed factual allegations, and the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (citing *Twombly*, 550 U.S. at 555).

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims in the complaint. *See Twombly*, 550 U.S. at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Cooney v. Rossiter*, 583 F.3d 967, 971 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). The mere possibility of misconduct falls short of meeting this plausibility standard. *Iqbal*, 556 U.S. at 678–79; *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

In ruling on a Rule 12(b)(6) motion to dismiss, the court does not look at whether the plaintiff will "ultimately prevail but whether the [plaintiff] is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The court may consider allegations contained in the pleadings, exhibits attached to the complaint, and documents and matters properly subject to judicial notice. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 899 (9th Cir. 2007); *Roth v. Garcia Marquez*, 942 F.2d 617, 625 n.1 (9th Cir. 1991). The court must assume the truth of the facts presented and construe all inferences from them in the light most favorable to the nonmoving party.

6

*Buckey v. Cty. of Los Angeles*, 968 F.2d 791, 794 (9th Cir. 1992). However, the court is "not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994). Moreover, when an allegation in the complaint is refuted by an attached document, the Court need not accept the allegation as true. *Roth*, 942 F.2d at 625 n.1.

## 2.  Standards Applicable to *Pro Se* Litigants

With respect to an inmate who proceeds *pro se*, his factual allegations, "however inartfully pleaded," must be held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (reaffirming that this standard applies to *pro se* pleadings post-*Twombly*). Thus, where a plaintiff appears *pro se* in a civil rights case, the Court must construe the pleadings liberally and afford plaintiff any benefit of the doubt. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). However, in giving liberal interpretation to a *pro se* civil rights complaint, courts may not "supply essential elements of the claim that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). "The plaintiff must allege with at least some degree of particularity overt acts which defendants engaged in that support the plaintiff's claim." *Jones v. Cmty. Redevelopment Agency of Los Angeles*, 733 F.2d 646, 649 (9th Cir. 1984) (internal quotation omitted).

## B.  Analysis

### 1.  Eighth Amendment Claims

Plaintiff's amended complaint alleges that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when Defendants failed to issue him a lower bunk chrono, resulting in three falls from the upper bunk. (ECF No. 27 at 8.) Defendants argue that Plaintiff's amended complaint fails to cure the deficiencies of his original complaint and should be dismissed. (ECF No. 36-1 at 6.) The Court agrees. For the reasons set forth below, the Court finds that Plaintiff fails to state an Eighth

Amendment claim against any Defendant and recommends these claims be dismissed.

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). For a prisoner to demonstrate an Eighth Amendment violation, two components must be satisfied. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). First, the deprivation alleged must be sufficiently serious. *Id.* at 1059–60. A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* (citing *Estelle*, 429 U.S. at 104). The existence of "any injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" are examples of indications that a prisoner has a "serious" need for medical treatment. *Id.*; *accord Lopez v. Smith*, 203 F.3d 1122, 1131–32 (9th Cir. 2000).

Here, Plaintiff alleges that he experienced chronic pain necessitating a lower bunk chrono. (ECF No. 27 at 31–38.) Defendants do not dispute that Plaintiff adequately alleges a serious medical need. (ECF No. 36-1 at 11.) Thus, for purposes of this motion to dismiss, the Court concludes that Plaintiff pleads sufficient facts to state the first component of an Eighth Amendment claim.

Second, the prison officials involved must have acted with deliberate indifference to the inmate's serious medical needs. *See Wilson v. Seiter*, 501 U.S. 294, 302–04 (1991). This is a subjective requirement. *Farmer v. Brennan*, 511 U.S. 825, 839 (1994). To act with deliberate indifference, a prison official must know of and disregard an excessive risk to the inmate's health and safety. *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2002) (citing *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also

8

draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). The court must focus on "what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be)." *Farmer*, 511 U.S. at 838–39. "Even if a prison official *should* have been aware of the risk, if he 'was not, then he has not violated the Eighth Amendment, no matter how severe the risk.'" *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (quoting *Gibson*, 290 F.3d at 1188) (emphasis in original).

To amount to an Eighth Amendment violation, deliberate indifference to an inmate's serious medical needs must be substantial; inadequate treatment due to malpractice, or even gross negligence, does not amount to a constitutional violation. *Estelle*, 429 U.S. at 106; *Toguchi*, 391 F.3d at 1060. A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established. *McGuckin*, 974 F.2d at 1060.

Furthermore, differences in judgment between a prisoner and a prison official regarding an appropriate medical diagnosis and course of treatment are not enough to establish a deliberate indifference claim. *See Estelle*, 429 U.S. at 107–08; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). To establish deliberate indifference, the prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). On the other hand, if the prison official responded reasonably to a risk to the prisoner's health, he or she cannot be found liable, even if harm was not ultimately avoided. *Farmer*, 511 U.S. at 844.

For the reasons discussed below, Plaintiff's amended complaint fails to state a claim that Defendants were deliberately indifferent to his serious medical needs.

### a. Failure to Provide, Or Delay in Providing, Medical Care

As an initial matter, Plaintiff alleges that Defendants were deliberately indifferent to his medical needs when they failed to provide medical care, or only provided delayed medical care. Plaintiff alleges that as a result of Defendants "not taking any measures

9

during the first and second fall until after the third fall," Plaintiff was seriously injured in his third fall from the upper bunk. (ECF No. 27 at 60.) Plaintiff further alleges that the "delay in treatment for medical accommodations was medically unacceptable" and his "serious medical needs was [sic] not timely treated and/or properly treated by each Defendant." (*Id*. at 54–55.)

To the extent Plaintiff argues that Defendants failed to provide any medical care or only provided delayed medical care after Plaintiff's alleged falls, the record reflects otherwise. Plaintiff's medical records indicate that he was provided prompt medical care after he submitted health care services request forms and after each alleged fall. Nurse Gines examined Plaintiff on August 5, 2015, the day after Plaintiff submitted a health services request form seeking medical attention and two days after his first alleged fall from the upper bunk. (ECF No. 1 at 229–31.) Nurse Gines and Defendant Yu examined Plaintiff on the same day as the alleged second fall. (*Id*. at 96–97, 232–34.) The day after Plaintiff's third alleged fall, two physicians, Drs. Deel and Guldseth, both examined Plaintiff and provided medical treatment. (*Id*. at 135, 294–95.) Although Defendants may not have provided Plaintiff with the specific care he desired—a lower bunk accommodation—Plaintiff was promptly provided with medical care.

### b. *Defendant Yu*

As stated above, Defendant Yu was a doctor at RJDCF and Plaintiff's primary care physician. (ECF No. 1 at 256.) Plaintiff alleges that Defendant Yu's decision not to issue Plaintiff a lower bunk chrono was medically unreasonable and made in conscious disregard of an excessive risk to Plaintiff's health. (ECF No. 27 at 38–42, 62–63.) The Court previously dismissed Plaintiff's Eighth Amendment claims against Defendant Yu because the original complaint failed to allege sufficient facts to state a claim of deliberate indifference. (ECF No. 21 at 23.) After a careful analysis of Plaintiff's 75-page amended complaint, 647 pages of exhibits attached to the amended complaint, and 353 pages of exhibits attached to the original complaint, the Court finds that Plaintiff's amended complaint fails to remedy the shortcomings of his original complaint. In sum, Plaintiff's

allegations amount to no more than a difference of opinion between himself and Defendant Yu regarding the proper course of medical treatment. Accordingly, the Court recommends dismissal of Plaintiff's Eighth Amendment claims against Defendant Yu.

### i. *Medical History and Complaints of Pain*

Plaintiff alleges that Defendant Yu was aware of Plaintiff's medical history and complaints of pain, but nonetheless consciously disregarded the excessive risk that Plaintiff would fall while climbing down from his upper bunk when he refused to issue Plaintiff a lower bunk chrono. (ECF No. 27 at 14, 57.) Plaintiff alleges over sixty medical appointments with various medical personnel and complaints of pain between January 9, 2014 and December 31, 2015.[8] Plaintiff communicated complaints of neck, back, knee, elbow, shoulder, and foot pain to Defendant Yu during the course of his six appointments between February and August 2015. (*Id*. at 36–43.) Plaintiff alleges that Defendant Yu examined Plaintiff's medical history on multiple occasions and knew of Plaintiff's latest episode of syncope in October 2013, but unreasonably declined to provide Plaintiff with a lower bunk in light of this history. (*Id*. at 36–43.)

After careful analysis of Plaintiff's detailed medical records, this Court previously ruled that Defendant Yu was not deliberately indifferent to Plaintiff's complaints of neck, back, knee, or foot pain, or any combination thereof, when he declined to issue a lower bunk chrono. (ECF No. 21 at 16–19.) This Court found that Defendant Yu's response to Plaintiff's complaints of pain was prompt and was not unreasonable. (*Id*.) This Court also found that Defendant Yu's treatment was not unreasonable in light of Plaintiff's syncope and cardiologic histories. (*Id*. at 19–20.) Plaintiff fails to plead any new, relevant factual

---

[8] Between January 2014 and December 2015, Plaintiff reported knee locking, degeneration, and pain to medical providers. (*Id*. at 32–49.) Between April 2014 and October 2015, Plaintiff experienced chronic and severe foot pain and ankle issues. (*Id*. at 34–45.) Plaintiff complained of back and neck pain between June 2014 and October 2015. (*Id*. at 35–46.) Between June 2015 and October 2015, Plaintiff complained of elbow and shoulder pain. (*Id*. at 39–46.) Plaintiff also has a medical history of hypertension, chest pain, Hepatitis C, neck pain, back pain, and arthritis, and experienced a syncope episode in October 2013. (*Id*. at 34–36.)

11

allegations relating to his complaints of neck, back, knee, or foot pain that the Court has not already considered and found insufficient to state a claim against Defendant Yu. Nor does Plaintiff plead any new, relevant factual allegations relating to Defendant Yu's knowledge of Plaintiff's medical history and his chosen course of treatment in light of this history. Accordingly, for the same reasons as set forth in the Court's prior Report and Recommendation,[9] these allegations are insufficient to state a claim of deliberate indifference. (*Id*. at 16–20.)

Plaintiff's allegations regarding his complaints of shoulder and elbow pain are insufficient to state a claim of deliberate indifference against Defendant Yu. Plaintiff's medical records indicate that on June 22, 2015, Plaintiff complained to Defendant Yu of a sharp pain in his right elbow, which Plaintiff claimed made him unable to climb. (ECF No. 1 at 272.) Defendant Yu physically examined Plaintiff and found that he could lift his right elbow high, could flex and extend his elbow without any difficulty, and did not have any tenderness. (*Id*.) Defendant Yu concluded that Plaintiff's right elbow pain was "benign." (*Id*.) On July 20, 2015, Plaintiff again complained to Defendant Yu of elbow pain and also complained of right shoulder pain. (*Id*. at 276.) Plaintiff complained that he was experiencing pain predominantly in his right shoulder blade, which made it difficult for him to do pushups. (*Id*.) Defendant Yu noted that Plaintiff reported no trauma to either his elbow or shoulder. (*Id*.) Defendant Yu performed a physical examination of Plaintiff and found that he had a full range of motion in his shoulder, could rotate and lift his arm high, but complained of tenderness to touch. (*Id*.) Defendant Yu found that Plaintiff was able to flex and extend his elbow and had "good pulses, good sensation." (*Id*.) He noted that Plaintiff had been prescribed Tylenol for his complaints of pain and further referred Plaintiff to a physical therapist and ordered an x-ray of Plaintiff's elbow. (*Id*. at 276, 279.) On August 20, 2015, Defendant Yu adjusted Plaintiff's pain medication to treat his joint

---

[9] As stated above, the Honorable Roger T. Benitez adopted in full the Court's Report and Recommendation on September 13, 2017. (ECF No. 26.)

pain. (*Id.* at 282.)

Plaintiff's medical records indicate that Defendant Yu's response to Plaintiff's complaints of elbow and shoulder pain was not unreasonable under the circumstances. The complaint does not allege any facts that contradict Plaintiff's medical records or that would otherwise allow the Court to draw the reasonable inference that Defendant Yu purposefully ignored or failed to respond to Plaintiff's possible need for a lower bunk chrono based on his complaints of elbow and shoulder pain. *See Toguchi*, 391 F.3d at 1058. Thus, the allegations regarding Defendant Yu's responses to Plaintiff's complaints of elbow and shoulder pain are insufficient to state a claim of deliberate indifference.

Accordingly, the factual allegations in Plaintiff's amended complaint fail to state a claim that the course of treatment Defendant Yu chose was medically unacceptable and made in conscious disregard of an excessive risk to Plaintiff's health in light of Plaintiff's medical history and complaints of pain.

### ii. Knowledge of Prior Falls

Plaintiff alleges that Defendant Yu[10] "knew that [sic] at least three falls off the top bunk in August and December 2015 involving Plaintiff"; "knew or should have known of the conditions that caused Plaintiff to fall off the top bunk"; "made a conscious choice to disregard the consequences of Plaintiff falling off the top bunk . . . by failing to act"; and "had knowledge of Plaintiff [sic] severe pain and suffering that resulted from falling off the top bunk." (ECF No. 27 at 10, 56–57.) Plaintiff alleges that Nurse Gines admitted in her August 21, 2015 report that Plaintiff had fallen off the top bunk. (*Id.* at 43.) Plaintiff further alleges that Dr. Deaton's September 3, 2015 progress report admits that Plaintiff reported he fell while attempting to step down from the top bunk. (*Id.*)

Plaintiff fails to support his conclusory statement that Defendant Yu had knowledge of his three alleged falls with any factual allegations. This Court previously found that

---

[10] Some of Plaintiff's allegations refer generally to all Defendants. Plaintiff's allegations against supervisory Defendants are addressed below.

Plaintiff failed to allege that Defendant Yu was ever made aware of any of Plaintiff's alleged falls from the top bunk. (ECF No. 21 at 33.) Plaintiff's amended complaint does not remedy this failure. Plaintiff does not allege that he communicated his alleged falls to Defendant Yu. Plaintiff also does not allege that Nurse Gines, Doctor Deaton, or any other person ever communicated to Defendant Yu that Plaintiff had fallen off the top bunk. (*See* ECF No. 27 at 10, 43, 56–57.) Nor does Plaintiff allege that Defendant Yu ever read Nurse Gines' or Dr. Deaton's reports. (*See id*.)[11] As the Court previously noted, to the contrary, Plaintiff's medical records indicate that after the alleged August 21, 2015 fall, Plaintiff represented to Defendant Yu that he "has had no falls." (ECF No. 1 at 281.)[12] Furthermore, Defendant Yu could not have had knowledge of Plaintiff's alleged December 2015 fall because Defendant Yu last treated Plaintiff on August 21, 2015, after which Dr. Guldseth became Plaintiff's primary care physician. (*Id*. at 50.)[13] Plaintiff's amended complaint merely repeats conclusory statements that all Defendants at some unspecified time and through an unspecified manner knew of Plaintiff's falls off the top bunk. As this Court previously found, such conclusory allegations are insufficient to establish that Defendant Yu had knowledge of Plaintiff's alleged falls.

Even if the Court were to assume that Defendant Yu had knowledge of Plaintiff's alleged August 21, 2015 fall, the factual allegations in Plaintiff's complaint are insufficient to state a claim of deliberate indifference. Deliberate indifference requires not only knowledge of a serious risk, but also a purposeful disregard of that risk. Plaintiff "must show that the course of treatment [Defendant Yu] chose was medically unacceptable under

---

[11]The reports themselves do not indicate that they were reviewed by Defendant Yu. (*See* ECF No. 1 at 232–34, 309–10.)

[12] Granted, Plaintiff made this statement in the context of discussing his foot problems. It seems unlikely, however, that that Plaintiff's general representation that he "has had no falls" would apply only in this context.

[13] In his opposition to Defendants' motion to dismiss, Plaintiff states that Defendant Yu prescribed Plaintiff medication through 2016. (ECF No. 40 at 29.) Plaintiff's medical records indicate that Defendant Yu only prescribed Plaintiff medication in 2015, but the prescriptions for some of these medications did not expire until 2016. (ECF No. 27-3 at 40, 59, 71, 76, 90, 91, 94, 110, 116; ECF No. 27-4 at 5, 52.)

the circumstances . . . and . . . that [he] chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson*, 90 F.3d at 332. After Plaintiff's alleged second fall, Defendant Yu examined Plaintiff and ordered x-rays. (ECF No. 1 at 232–34.) Defendant Yu declined to issue Plaintiff a lower bunk chrono until after the x-ray results were examined. (*Id*.) On September 3, 2015, Dr. Deaton saw Plaintiff for a follow up appointment and reviewed the x-ray results. (*Id*. at 309–10.) The x-rays showed that Plaintiff had mild to moderate arthritis and no acute fracture in his hip and pelvis, and minimal arthritis and no fracture, dislocation, or effusion in his left knee. (*Id*. at 309.) Plaintiff does not allege facts that would allow the Court to reasonably infer that Defendant Yu's decision to order x-rays and examine the results prior to providing Plaintiff with a lower bunk chrono was medically unacceptable under the circumstances, or that Defendant Yu chose this course of treatment in conscious disregard for Plaintiff's health.

### iii. Knowledge of No Ladder in Plaintiff's Cell

Plaintiff alleges that Defendant Yu was deliberately indifferent to the risk Plaintiff would fall from the upper bunk because Defendant Yu knew that Plaintiff's bunk did not have a ladder. (*See* ECF No. 27 at 40, 63.) Plaintiff alleges that his knee and elbow pain "effected [sic] his mobility to climb because there is not a ladder for access to the top bunk at any cell in RJDCF." (*Id*. at 40.) Plaintiff does not allege that he communicated that his cell did not have a ladder to assist him in accessing the upper bunk to Defendant Yu. (*See id*.) Nor does Plaintiff allege that Defendant Yu was otherwise made aware of the fact that Plaintiff's cell did not contain a ladder. The amended complaint fails to allege any facts from which the Court could draw the reasonable inference that Defendant Yu was aware that Plaintiff's cell did not contain a ladder to assist Plaintiff in climbing to the upper bunk. Plaintiff's original complaint suffered from the same absence of allegations to suggest that Defendant Yu was aware that Plaintiff's cell did not contain a ladder. (ECF No. 21 at 21–22.) Thus, Plaintiff fails to allege that Defendant Yu knew of, let alone purposefully disregarded, the fact that Plaintiff was required to climb to his upper bunk using furniture instead of a ladder.

15

### iv. Prescription of Medication With Potential Side Effects

Plaintiff alleges that Defendant Yu had knowledge of, and deliberately disregarded, the risk that the potential side effects of medication Plaintiff was prescribed would cause him to fall off the top bunk.  (ECF No. 27 at 58.)[14]  Among other medications, Plaintiff was prescribed hydrochlorothiazide (ECF No. 27-3 at 117; ECF No. 27-4 at 5, 62), ribavirin (ECF No. 27-4 at 39),[15] lisinopril (ECF No. 27-3 at 116; ECF No. 27-4 at 5, 32), and amlodipine (ECF No. 27-3 at 116; ECF No. 27-4 at 5, 62) during his time at RJDCF.[16]  Plaintiff alleges that these medications can cause dizziness, lightheadedness, and fainting. (ECF No. 27 at 28–29; ECF No. 27-1 at 56, 99, 103, 108, 114.)[17]  Plaintiff alleges that Defendant Yu knew that Plaintiff had a history of lightheadedness and syncope because on February 10, 2015, Defendant Yu indicated that some of the medications Plaintiff was prescribed in 2013 likely caused a syncope episode.  (ECF No. 27 at 36–37.)  Plaintiff further alleges that Defendant Yu knew Plaintiff experienced dizziness.  Specifically, he alleges that on April 8, 2015, Defendant Yu reviewed a report indicating that Plaintiff has occasional dizziness and lightheadedness.  (*Id*. at 37.)[18]  On August 20, 2015, Plaintiff alleges that he communicated to Defendant Yu that he was feeling drowsy and Defendant

---

[14] Plaintiff alleges that all Defendants were deliberately indifferent in prescribing medications with these side effects, but only alleges that Defendant Yu, of the named Defendants, prescribed him any of these medications.  Accordingly, the Court only considers Defendant Yu's actions here.  Liability of other named Defendants in their supervisory capacity is considered below.

[15] Plaintiff's medical records indicate that Dr. Jayasundara prescribed Plaintiff ribavirin for twelve weeks on October 26, 2015.  (ECF No. 27-4 at 39.)

[16] Plaintiff also attaches an informational sheet indicating that antipsychotic medications may result in lightheadedness or dizziness (*id*. at 114), but fails to identify which, if any, antipsychotic medications he was prescribed during the period in which he allegedly fell from the top bunk.

[17] Specifically, Plaintiff attaches as exhibits to his amended complaint informational sheets representing the following: Hydrochlorothiazide may result in "feeling faint or lightheaded, falls" (ECF No. 27-1 at 103); Ribavirin may cause "dizziness or lightheadedness" (*id*. at 108); Lisinopril may cause "dizziness, faintness, or lightheadedness when getting up suddenly from a lying or sitting position" (*id*. at 55–56); and Amlodipine Besylate, Atorvastatin Calcium may result in feeling faint or lightheaded, or falls (*id*. at 99).

[18] Dr. Birgersdotter-Green's April 7, 2015 progress notes indicate that Plaintiff reported occasional "dizzy/lightheaded with exertion, but no syncopal episodes."  (ECF No. 1 at 169.)

Yu admitted that some of the medication Plaintiff was taking could make him feel drowsy. (*Id.* at 42.) Plaintiff alleges that "Defendant Yu admit [sic] he knows medication makes Plaintiff lightheaded, drowsy. Defendant Yu admit [sic] he knew of the substantial risk of serious harm to Plaintiff's health and safety." (*Id.*)[19] Plaintiff argues that Defendant Yu's failure to provide him with a lower bunk accommodation while prescribing him medication with the potential side effects of lightheadedness, dizziness, and fainting represented a deliberate indifference to the risk that Plaintiff would fall off the top bunk. (*Id.* at 58, 60.)

To establish deliberate indifference, Plaintiff must do more than allege Defendant Yu knew of a substantial risk of serious harm to Plaintiff's health or safety. *McGuckin*, 974 F.2d at 1060. Plaintiff must allege that Defendant Yu purposefully ignored or failed to respond to his pain or possible medical needs. *Id.* Plaintiff fails to make this showing.

First, Plaintiff fails to allege facts that would allow the Court to infer that Defendant Yu purposefully ignored or failed to respond to Plaintiff's complaints of drowsiness and dizziness and his history of syncope. Plaintiff's medical records indicate that Defendant Yu repeatedly and carefully examined Plaintiff, reviewed his medical records, and altered Plaintiff's medication in response to his findings.

On February 10, 2015, Defendant Yu reviewed Plaintiff's medical history, which indicated that Plaintiff had felt lightheaded and experienced a syncope episode in October 2013. (ECF No. 1 at 256.)[20] Defendant Yu concluded, and communicated to Plaintiff, that

---

[19] In light of Plaintiff's use of the word "admit" and his pattern of bookending factual allegations with legal conclusions throughout the amended complaint, the Court does not construe Plaintiff's statement that "Defendant Yu admit [sic] he knew of the substantial risk of serious harm to Plaintiff's health and safety" as an allegation that Defendant Yu stated that he acknowledged Plaintiff's prescribed medication represented a serious risk of harm. (*See* ECF No. 27 at 42.) However, even if the Court were to construe this statement as an acknowledgement by Defendant Yu that Plaintiff's medication presented a serious risk of harm, for the reasons stated in this section, Plaintiff fails to allege facts that would allow the Court to reasonably infer that Defendant Yu's chosen course of treatment was medically unacceptable under the circumstances and chosen in conscious disregard of an excessive risk to Plaintiff's safety. *See Jackson*, 90 F.3d at 332.

[20] As this Court previously noted, the medical records attached to Plaintiff's original complaint indicate that Plaintiff suffered a syncope episode in October 2013. (ECF No. 1 at 152.) This episode caused him to lose consciousness and fall while trying to get out of bed. (*Id.*) Plaintiff was thereafter monitored for

17

at the time Plaintiff experienced the syncope episode "[h]e was taking a lot of tramadol, Vicodin, Neurontin, Ambien, other medication Paxil," which can cause "lightheadedness or passing out because overload [sic] his body by medication can depress mentally" and "can cause a syncope-like episode." (*Id*. at 257.) Defendant Yu found that "[s]ince he stopped those medications and cut down the lisinopril from 40 to 20 mg, he has had no syncope episodes, no feeling of arrhythmias." (*Id*.) On April 21, 2015, Plaintiff saw Defendant Yu again for a follow-up appointment. (*Id*. at 260–61.) At this appointment, Defendant Yu performed an examination of Plaintiff and reviewed his medical records. (*Id*. at 260.) Defendant Yu noted that the doctor that saw Plaintiff for his syncope and cardiac history after their last appointment also concluded that Plaintiff was "doing fine" in these regards. (*Id*.) Plaintiff saw Defendant Yu again on May 13, 2015. (*Id*. at 262–63.) In his progress notes, Defendant Yu indicated that Plaintiff "has been evaluated as being syncopal . . . [and] has a recording device on the chest to see any arrhythmias . . . but since he has been in the prison system, he has not had syncope." (*Id*. at 262.) Defendant Yu also noted that a cardiologist is monitoring Plaintiff's loop recording but there has been no arrhythmia. (*Id*. at 262–63.)

Plaintiff alleges that on August 20, 2015, he communicated to Defendant Yu that he felt drowsy in the morning. (ECF No. 27 at 42.) During this appointment, Plaintiff also requested an increase in his Trileptal medication to treat his back and joint pain. (ECF No. 1 at 282.) After an examination of Plaintiff and his medical records, Defendant Yu found that "a couple of medications he is taking can make him drowsy," including Vistaril and Trileptal. (*Id*. at 281.) Defendant Yu concluded that it was more likely that the Vistaril was causing Plaintiff's drowsiness, but that it could also be the Trileptal. (*Id*. at 282.) Defendant Yu decided to continue the prescription of Vistaril and not to prescribe Trileptal for one week to see if there was a change in Plaintiff's feelings of drowsiness. (*Id*.) If

subsequent syncope events, and the medical records indicate that Plaintiff never suffered another episode. (*See, e.g.*, ECF No. 1 at 155, 159, 164–66.)

16-cv-01998-BAS-JLB

Plaintiff's drowsiness did not change, Defendant Yu indicated that he would increase the Trileptal, as Plaintiff had requested, because this medication was unlikely to be the cause of Plaintiff's drowsiness. (*Id.*) At this appointment, Defendant Yu again denied Plaintiff's request for a lower bunk chrono as there was no medical indication that Plaintiff required this accommodation. (*Id.*) As previously stated, Defendant Yu saw Plaintiff for the last time on August 21, 2015. Plaintiff does not allege any facts that contradict his medical records or that would otherwise allow the Court to infer that Defendant Yu acted with deliberate indifference in his response to Plaintiff's history of syncope and complaints of dizziness or drowsiness.

Second, Plaintiff merely alleges that the hydrochlorothiazide, ribavirin, lisinopril, antipsychotic medication, and amlodipine he was prescribed *may* cause dizziness, lightheadedness, or fainting. Aside from the dizziness addressed above,[21] Plaintiff does not allege that he actually experienced any of these side effects at RJDCF; much less, that he communicated to Defendant Yu that he was experiencing these side effects. In fact, Plaintiff does not allege that he fell off the top bunk because he was experiencing dizziness, lightheadedness, or fainting.[22]

At most, Plaintiff's allegations amount to no more than a difference of opinion regarding the specific medications Defendant Yu should have prescribed. However, differing opinions on medical treatment, without more, do not amount to a violation of the Eighth Amendment. *See Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). Plaintiff has alleged no facts indicating

---

[21] Plaintiff's history of dizziness prior to 2014 and dizziness with exertion reported on April 7, 2015.

[22] Plaintiff alleges that his first fall occurred when "his left knee gave out." (ECF No. 27 at 41.) Nurse Gines' August 21, 2015 encounter form indicates that Plaintiff stated the second fall occurred when his knee locked while he was climbing down from the top bunk (ECF No. 1 at 232); Dr. Deaton's September 3, 2015 progress notes state that Plaintiff reported that "he slipped on the stool" while stepping down from his top bunk on the second fall (*id.* at 309). Lastly, Dr. Guldseth's progress notes indicate that Plaintiff reported after the third fall that he twisted his ankle when he "stepped off his bunk onto a stool wrong and twisted his right leg." (*Id.* at 298.) Plaintiff's original complaint also failed to allege that he fell from the upper bunk due to an episode of syncope or lightheadedness. (ECF No. 1; ECF No. 21 at 20.)

that Defendant Yu's chosen course of treatment was medically unacceptable under the circumstances. *See id.* To the contrary, the medical records indicate that Defendant Yu's evaluation of Plaintiff's medications was not unreasonable. *See Farmer*, 511 U.S. at 844. Accordingly, Plaintiff fails to allege facts sufficient to state a claim that Defendant Yu's course of treatment was medically unacceptable and that he deliberately disregarded an excessive risk that the medications he prescribed would make Plaintiff feel dizzy, lightheaded, or faint and then cause him to fall off the top bunk.

> ### v. Disregard of Lower Bunk Policy

Plaintiff alleges that Volume 4, Chapter 23 of the California Correctional Health Care Service ("CCHCS") procedures provides that "[a]dvance age [sic] of 60 automatically qualify for lower tier lower bunk," and that all Defendants purposefully ignored this policy. (ECF No. 27 at 25.) The language of CCHCS policies and procedures directly contradict this allegation.

Although Plaintiff does not attach Chapter 23, the Court may *sua sponte* take judicial notice of this chapter. *See* Fed. R. Evid. 201(c). The CCHCS website contains an index of Volume 4, Chapter 23 inmate medical services policies and procedures, including CHCS's Comprehensive Accommodation Policy and Procedure. *Cal. Comprehensive Accommodation Policy*, Volume 4, Chapter 23 (last revised 05/2017); *Cal. Comprehensive Accommodation Procedure*, Volume 4, Chapter 23.1 (last revised 05/2017), https://cchcs.ca.gov/imspp/.[23] The Court may take judicial notice of the Chapter 23 materials as the content can be accurately and readily determined from a governmental agency's website whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid.

---

[23] Plaintiff refers to "Chapter 23 Health Care Service Accommodation Chrono IV 23-2" in his amended complaint. (ECF No. 27 at 25.) The master CCHCS index of policies and procedures indicates that a Volume 4, Chapter 23.2 does not exist, and has not previously existed. *See* https://cchcs.ca.gov/wp-content/uploads/sites/60/2018/06/IMSPP-Contents.pdf. Chapter 23 consists of a Chapter 23 policy, entitled "Comprehensive Accommodation Policy," and a Chapter 23.1 procedure, entitled "Comprehensive Accommodation Procedure." *See* https://cchcs.ca.gov/imspp/. The Court construes Plaintiff's citation as a reference to both the Chapter 23 Policy and Procedure.

201(b).  *See also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010); *Karkanen v. Family Court Servs. of Contra Costa Cty.*, No. 17-CV-00999-HSG, 2017 WL 2730227, at *1 (N.D. Cal. June 26, 2017) (taking *sua sponte* judicial notice of content of governmental agency's website).

CCHCS's Volume 4, Chapter 23 Comprehensive Accommodation Policy and Procedure provide that CCHCS "shall provide medically necessary accommodations to patients to ensure equal access to prison services, programs, and activities."  *Cal. Comprehensive Accommodation Policy*, Volume 4, Chapter 23, at 1; *Cal. Comprehensive Accommodation Procedure*, Volume 4, Chapter 23.1, at 1.  "Accommodation decisions shall be based on guidance provided in the Comprehensive Accommodation Formulary and clinical judgment, or may be ordered as a nonformulary accommodation as medically necessary."  *Id*.  A nonformulary accommodation is defined as an "accommodation not listed in the formulary or a formulary accommodation based on medical necessity."  *Id*. Plaintiff attaches to his amended complaint the Comprehensive Accommodation Formulary contained in RJDCF's Operational Plan.  (ECF No. 27-1 at 92–95.)  The Comprehensive Accommodation Formulary provides a list of indications that may establish a lower bunk is medically necessary.  (*Id*. at 95.)  None of these indications include being over the age of sixty (or over any specified age).  (*See id*.)  Thus, the fact that Plaintiff is over the age of sixty does not mean that he "automatically qualif[ies]" for a lower bunk under CCHCS policies and procedures.  (*See* ECF No. 27 at 25.)  Instead, the policies and procedures provide that if Plaintiff does not meet one of the medical indications for a lower bunk listed in the Comprehensive Accommodation Formulary, a nonformulary accommodation based on medical necessity may be ordered.  *Cal. Comprehensive Accommodation Policy*, Volume 4, Chapter 23, at 1; *Cal. Comprehensive Accommodation Procedure*, Volume 4, Chapter 23.1, at 1.

### vi. Prior Medical Opinions

Plaintiff alleges that Defendant Yu acted with deliberate indifference when he disregarded the opinions of other health care providers who recommended a lower bunk.

21

(ECF No. 27 at 53, 56.) Plaintiff alleges that Defendants "deliberately ignored the express lower bunk accommodations order of Plaintiffs['] prior physicians' [sic] for reasons unrelated to the medical needs and/or substantial risk of serious harm or safety measures." (*Id*. at 56.) He alleges, "[f]rom 2012-2017 and now doctors found pre and post falls of the bunk that significantly impacted Plaintiff's daily activities that there was a significant need for a permanent medical lower bunk chrono." (*Id*. at 58.)

As to Plaintiff's prior physicians, Plaintiff alleges that on September 10, 2013, Dr. Daniel issued Plaintiff a lower bunk chrono. (*Id*. at 30; ECF No. 1 at 129.) Plaintiff alleges that when he was transferred to RJDCF on December 2, 2013, he was transferred with a permanent lower bunk chrono. (ECF No. 27 at 31; ECF No. 1 at 86.) On December 5, 2013, Plaintiff alleges that Dr. Pasha "saw a need to update Plaintiffs' computer medical chrono . . . bottom bunk." (ECF No. 27 at 31.)[24] On June 7, 2014, Plaintiff alleges that Dr. Garikaparthi stated that Plaintiff could get a lower bunk chrono because he was over sixty years old. (*Id*. at 31.) Plaintiff alleges that his need for lower bunk was "obvious" and that other doctors "for years saw a need for a medical lower bunk chrono." (*Id*. at 53.)

As to Plaintiff's medical providers that saw Plaintiff after Defendant Yu, Plaintiff alleges that on September 28, 2015, physical therapist T. Domingo "saw a need to recommend that Plaintiff be placed on a lower bunk to limit movement that may aggravate pain especially to bilateral knees." (ECF No. 27 at 32.) Plaintiff also alleges that in late 2015, Drs. Deel and Guldseth both saw a need for a lower bunk chrono. (*Id*. at 32–33.) On October 16, 2015, Dr. Guldseth recommended a temporary lower bunk chrono, noting that he "explained to the patient that the lower bunk might be removed depending on future workup." (ECF No. 27-4 at 33.) On December 8, 2015, Plaintiff alleges that he submitted a health care services request form as he had not received a lower bunk chrono. (ECF No.

---

[24] Plaintiff's medical records indicate that Dr. Pasha issued a permanent chrono on December 5, 2013 that designates Plaintiff for outpatient care, having full duty functional capacity, as high medical risk, and for uncomplicated nursing, but does not specifically recommend placing Plaintiff on a lower bunk. (ECF No. 1 at 132.)

27 at 47; ECF No. 1 at 293.)  On December 28, 2015, after Plaintiff's alleged third fall from the upper bunk, Dr. Guldseth issued Plaintiff a permanent lower bunk chrono.  (*Id.* at 33; ECF No. 1 at 137–38.)  That same day, Dr. Deel issued a temporary lower bunk chrono. (*Id.* at 32; ECF No. 1 at 135–36.)

Plaintiff's allegations relating to *prior* medical providers' opinions fail to state a claim of deliberate indifference.  A "mere difference of medical opinion . . . is insufficient, as a matter of law, to establish deliberate indifference." *Toguchi*, 391 F.3d at 1058 (quoting *Jackson*, 90 F.3d at 332).  Here, Plaintiff alleges only that Defendant Yu should have followed prior medical providers' opinions.  Without more, these allegations are insufficient to state a claim of deliberate indifference.  As discussed above, Plaintiff fails to show that Defendant Yu's chosen course of treatment "'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to the prisoner's health.'"  *Id.* (quoting *Jackson*, 90 F.3d at 332).

To the extent Plaintiff alleges Defendant Yu's disregard of his *physical therapist's* lower bunk recommendation, made on September 28, 2015, amounts to deliberate indifference, this allegation is contradicted by Plaintiff's medical records.  As this Court previously found, Plaintiff's medical records establish that Defendant Yu did not treat Plaintiff after August 21, 2015.  (ECF No. 21 at 23; ECF No. 1 at 50.)  Accordingly, the Court cannot reasonably infer that the physical therapist's recommendation was available to Defendant Yu at the time he declined to issue Plaintiff a lower bunk chrono.

For the same reason, Plaintiff's allegations relating to *physicians'* opinions after August 2015 also fail to state a claim of deliberate indifference.  The Court cannot reasonably infer that Dr. Deel's and Dr. Guldseth's recommendations that Plaintiff be provided a lower bunk, both made on December 28, 2015, were available to Defendant Yu at the time he declined to issue Plaintiff a lower bunk chrono.  Furthermore, as discussed above, a mere difference in medical opinion between providers does not amount to deliberate indifference. *Toguchi*, 391 F.3d at 1058.  Accordingly, Plaintiff fails to state an Eighth Amendment claim against Defendant Yu on the ground that he impermissibly

ignored other medical providers' opinions.

For the reasons discussed above, the Court **RECOMMENDS** dismissal of Plaintiff's Eighth Amendment claims against Defendant Yu for failure to state a claim.

### c. *Supervisory Defendants*

Plaintiff alleges that Defendants' collective failure to provide Plaintiff with a lower bunk chrono, resulting in three alleged falls from the upper bunk, constituted deliberate indifference to his serious medical needs. Plaintiff alleges that Defendant Yu's supervisors, Defendants Walker, Glynn, Lewis, and Roberts, acted with deliberate indifference when they (1) personally participated in provision of medical care to Plaintiff; (2) denied Plaintiff's health care appeals; (3) failed to properly train subordinates; and (4) implemented a constitutionally deficient policy.

### i. *Direct Medical Services Provided By Walker and Roberts*

Plaintiff alleges that Defendants Walker and Roberts directly provided him with medical care, and thus, were personally involved in the alleged Eighth Amendment violations.[25] Plaintiff fails to support his conclusory allegations with well-pled facts from which the Court could reasonably infer that Defendants Walker and Roberts provided medical care in a manner that amounted to deliberate indifference to Plaintiff's serious medical needs.

Plaintiff alleges that Defendant Walker was personally involved in Plaintiff's medical care when Defendant Walker ordered x-rays of Plaintiff's left hip and left knee after the second alleged fall on August 21, 2015. (ECF No. 27 at 43.) Defendant Walker's tangential involvement in Plaintiff's medical care by once ordering an x-ray fails to establish that Defendant Walker personally participated in a constitutional violation.

---

[25] Plaintiff makes conclusory allegations that all Defendants were personally involved in his medical care (*see, e.g.*, ECF No. 27 at 53), but fails to support these conclusory statements with any factual allegations that Defendants Lewis and Glynn ever personally participated in his medical care. Therefore, the Court analyzes the allegations of liability as to Defendants Lewis and Glynn in the section addressing supervisory liability below.

Plaintiff fails to tie Defendant Walker's action to his allegation that Defendants were deliberately indifferent when they refused to provide him with a lower bunk chrono. Plaintiff does not allege that Defendant Walker ever physically examined him or treated him; much less that Defendant Walker's actions constituted participation in the decision of not to issue a lower bunk chrono. Nor does Plaintiff allege that Defendant Walker was deliberately indifferent when he ordered the x-ray for any other reason. Plaintiff fails to support his conclusory statement that Defendant Walker personally participated in a constitutional violation with well-pled facts.

Plaintiff alleges that Defendant Roberts was personally involved in his medical care because he prescribed Plaintiff "vallaren gel" on two occasions. (ECF No. 27 at 50.) As above, Plaintiff does not attempt to explain how the fact that Defendant Roberts prescribed Plaintiff vallaren gel on two occasions is in any way connected to the decision not to issue Plaintiff a lower bunk chrono. Nor does Plaintiff allege that Defendant Robert's prescription amounted to deliberate indifference for some other reason. Accordingly, Plaintiff fails to support his conclusory statement that Defendant Roberts personally participated in a constitutional violation with well-pled facts.

### ii. Allegations Against Defendants in Their Supervisory Roles

Plaintiff's remaining allegations against Defendants Walker, Glynn, Lewis, and Roberts relate to their actions as supervisors, instead of as direct providers of medical services. Plaintiff alleges that there is a "sufficient causal connection between [the supervisory Defendants'] wrongful conduct to not issue a medical lower bunk chrono in 2015, and [the] Eighth Amendment violation." (ECF No. 27 at 59.) Specifically, Plaintiff argues that a causal connection exists because Defendants Roberts, Glynn, Walker, and Lewis (1) promulgated and/or enforced "medical lower bunk policies so deficient that the policy itself participated in the Eighth Amendment violation"; (2) failed in their "training, supervision, or control of subordinates in not providing a medical lower bunk accommodations when the medical need existed"; and (3) had knowledge of the underlying constitutional violation by virtue of their review of Plaintiff's healthcare appeals, approval

of medical providers' requests for services, and as members of a reasonable accommodation panel, but impermissibly ignored the violation. (*Id*. at 11–13, 45–46, 50–51, 57–62.) All four supervisory Defendants—Walker, Glynn, Lewis, and Roberts—denied Plaintiff's health care appeals of Defendant Yu's decision that Plaintiff's condition did not merit a lower bunk. (ECF No. 1 at 50, 53–58, 62–66.)

The United States Supreme Court has held that there is no vicarious liability for civil rights violations. *Iqbal*, 556 U.S. at 676–77; *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Thus, under § 1983, "[a] supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a 'sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)); *see also Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). To demonstrate a sufficient causal connection, "a plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury." *Starr*, 652 F.3d at 1207 (quoting *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991)). "'The requisite causal connection can be established by setting in motion a series of acts by others' . . . or by 'knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury.'" *Id.* at 1207–08 (quoting *Redman*, 942 F.2d at 1447, then *Dubner v. City & Cty. Of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998).

First, as to Defendant Roberts, Judge Benitez previously dismissed *without leave to amend* Plaintiff's Eighth Amendment claim against Defendant Roberts for deliberate indifference under a theory of supervisory liability. (ECF No. 26 at 5.) Therefore, the Court recommends dismissal of those claims without further analysis.

Next, with respect to Defendants Walker, Glynn, and Lewis, Plaintiff cannot establish a causal connection between the supervisory Defendants' conduct and a constitutional violation because he fails to state an underlying constitutional violation. *See Hallman v. Cate*, 483 F. App'x 381, 381 (9th Cir. 2012); *Roman v. Knowles*, 07-cv-1343 JLS (POR), 2009 WL 1675863, at *4 (S.D. Cal. June 15, 2009). For the reasons stated above, Plaintiff fails to state a claim that the medical care provided by Defendants Yu, Walker, or Roberts was constitutionally deficient. The Honorable Roger T. Benitez previously found the same with respect to Doctor Guldseth, Plaintiff's other primary care physician. (ECF No. 5 at 8–9.)[26] Plaintiff does not allege that Defendants' subordinates committed any other constitutional violation. Accordingly, Plaintiff fails to state a claim against Defendants Glynn, Walker, and Lewis for actions taken in their supervisory capacity.

Finally, as to allegations that these supervisory defendants had liability due to their review of Plaintiff's health care appeals, Judge Benitez previously dismissed these claims *with prejudice*. (ECF No. 26 at 5.) Plaintiff's reasserted claims against Defendants for their review of Plaintiff's health care appeals should also be dismissed for this reason. (*See id.*)

### d. Leave to Amend

Pursuant to Federal Rule of Civil Procedure 15(a)(2), a court should grant leave to amend when justice so requires "even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (citation omitted). "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). *See also Carvalho v. Equifax Info. Servs.*, LLC, 629 F.3d 876, 893 (9th Cir. 2010). A court may properly deny leave to amend where a plaintiff has already amended the complaint and does not correct the deficiencies that

---

[26] As previously noted, Plaintiff does not name Dr. Guldseth as a defendant in his amended complaint.

caused the original complaint to fail to state a claim on which relief can be granted. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 809–10 (9th Cir. 1988) ("Repeated failure to cure deficiencies by amendments previously allowed is [a] valid reason for a district court to deny a party leave to amend.") (citation omitted). The "district court's discretion over amendments is especially broad where the court has already given a plaintiff one or more opportunities to amend his complaint." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 n.3 (9th Cir. 1987) (citations omitted).

In his opposition to Defendants' motion to dismiss, Plaintiff asserts for the first time that "Dr. Yu seemed mad that Plaintiff put in an appeal against him as staff misconduct, and was taking away Plaintiff's lower bunk chrono in retaliation." (ECF No. 40 at 26.) Plaintiff asserts that after he filed a grievance for Defendant Yu's initial refusal to renew Plaintiff's lower bunk chrono, "Defendant Yu would no longer discuss or report anything Plaintiff had to say, and began to dismiss him from his office and ignored Plaintiff from anything else he had to say." (*Id.*) The Court cannot say with certainty that any attempt to amend Plaintiff's claims against Defendant Yu would be futile as Plaintiff appears to argue that Defendant Yu denied him a lower bunk accommodation in retaliation for Plaintiff's filing of a grievance and not for a valid medical reason. *See Lopez*, 203 F.3d at 1130. Accordingly, the Court **RECOMMENDS** that Plaintiff's Eighth Amendment claim against Defendant Yu be **dismissed without prejudice**.[27]

Amendment of Plaintiff's claims against Defendants Walker, Glynn, Roberts, and Lewis, however, would be futile for two reasons. First, the Court previously provided Plaintiff with a detailed statement of the deficiencies of his original complaint and allowed

_____

[27] Any amended complaint must comply with the requirements of Local Civil Rule 8.2 governing complaints filed by prisoners under § 1983, which provides: "Additional pages not to exceed fifteen (15) in number may be included with the court approved form complaint, provided the form is completely filled in to the extent applicable in the particular case. The court approved form and any additional pages submitted must be written or typed on only one side of a page and the writing or typewriting must be no smaller in size than standard elite type. **Complaints tendered to the clerk for filing which do not comply with this rule may be returned by the clerk, together with a copy of this rule, to the person tendering said complaint.**" Civ.LR 8.2 (emphasis added).

Plaintiff an opportunity to amend. (*See* ECF Nos. 21, 26.) Plaintiff's amended complaint fails to remedy any of the deficiencies identified by the Court. *See McGlinchy*, 845 F.2d at 809–10. Second, it is clear from the extensive medical records, grievance forms, and appeal decisions attached to Plaintiff's complaints that he cannot allege any set of facts that would constitute a valid and sufficient claim against Defendants Walker, Glynn, Roberts, and Lewis. Plaintiff attaches 647 pages of exhibits to his amended complaint. (*See* ECF Nos. 27-1, 27-2, 27-3, 27-4, and 27-5.) In addition, 312 pages of exhibits were incorporated from Plaintiff's original complaint into his amended complaint. (*See* ECF Nos. 1, 21.) Among the 959 pages of exhibits are Plaintiff's medical records for the years of 2013 through 2017, which provide support and context for the factual allegations contained in Plaintiff's amended complaint. The Court has now analyzed Plaintiff's allegations and medical records in exhausting detail on several occasions. (*See* ECF Nos. 5, 21.) The Court's careful analysis of Plaintiff's voluminous medical records and factual allegations supports the conclusion that it is impossible for Plaintiff to correct the defects of his claims against Defendants Walker, Glynn, Roberts, and Lewis by amendment. Plaintiff's claims must be dismissed, not because he fails to allege an adequate amount of facts, but because he fails to allege facts that could possibly state a claim against any of these Defendants. The defects in Plaintiff's claims against Defendants Walker, Glynn, Roberts, and Lewis are not ones of error or omission, but instead are the result of a set of facts that simply fails to give rise to liability under § 1983. Accordingly, the Court **RECOMMENDS** Plaintiff's Eighth Amendment claims against Defendants Walker, Glynn, Roberts, and Lewis be **dismissed with prejudice.**

### 2. Qualified Immunity

Defendants argue that they are entitled to qualified immunity as to all of Plaintiff's claims. (ECF No. 36-1 at 15.) Qualified immunity entitles government officials to "*an immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). "The doctrine of qualified immunity

protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The purpose of qualified immunity is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* The driving force behind creation of the qualified immunity doctrine was a resolution to resolve unwarranted claims against government officials at the earliest possible stage of litigation. *Id.*

Courts conduct a two-prong analysis to determine whether a government official is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). First, examining the alleged facts in favor of the plaintiff, the court must consider whether the alleged facts show the government official's actions violated the plaintiff's constitutional rights. *Id.* at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* On the other hand, if a violation could be made out on a favorable view of the plaintiff's facts, then the court must next determine whether the constitutional right purportedly violated was clearly established in the specific context of the case at hand. *Id.*

In this case, as discussed above, the alleged facts fail to show that Defendants violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment when they declined to issue Plaintiff a lower bunk chrono. As no constitutional right was violated under the facts alleged in Plaintiff's complaint, Defendants are entitled to qualified immunity.

### 3. State Law Claims

Plaintiff's complaint raises several California state law claims: medical negligence and malpractice in violation of California Government Code § 845.6, failure to provide adequate personnel and failure to diagnose under California Government Code § 855, and violation of Article 1, Sections 15 and 17 of the California Constitution. (ECF No. 27 at

65-71.) The Honorable Roger T. Benitez previously adopted this Court's Recommendation stating that in the event Plaintiff fails to amend his complaint to sufficiently state an Eighth Amendment claim against any Defendant, the Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. (ECF No. 21 at 33; ECF No. 26.) As discussed above, Plaintiff failed to amend his complaint to state an Eighth Amendment claim, or any other federal claim, against any Defendant. Accordingly, the Court **RECOMMENDS that the District Court decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims**.

## IV. CONCLUSION

For the reasons discussed above, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) accepting this Report and Recommendation; and (2) **GRANTING** Defendants' Motion to Dismiss (ECF No. 36).

**IT IS ORDERED** that no later than **July 19, 2018**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 2, 2018**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

Dated: June 21, 2018

Hon. Jill L. Burkhardt
United States Magistrate Judge

16-cv-01998-BAS-JLB